**H. Richard BATES, Personal Representative of the Estate of Dr. Philip O. Littleford, deceased, Plaintiff,**

v.

**COOK, INC., Defendant.**

No. 84–512–ORL–CIV–18.

United States District Court,
M.D. Florida,
Orlando Division.

Dec. 20, 1984.

Herbert L. Allen, Orlando, Fla., for plaintiff.

Michael P. McMahon, Orlando, Fla., C. David Emhardt, Vincent O. Wagner, Indianapolis, Ind., for defendant.

## ORDER

GEORGE KENDALL SHARP, District Judge.

This case is before the Court upon defendant's motions: (1) for sanctions; (2) to amend its answer and counterclaim; (3) for summary judgment on collateral estoppel grounds; and (4) for summary judgment on statute of limitations grounds. Both parties have submitted memoranda and materials in support of and opposition to these motions. For the reasons discussed below, defendant's motions for sanctions, to amend and for summary judgment on collateral estoppel grounds are DENIED. Defendant's motion for summary judgment on statute of limitations grounds is GRANTED.

## STATEMENT OF FACTS

This diversity action involves an alleged misappropriation of trade secrets and head start in connection with the development and marketing of a method and related apparatus for the rapid insertion of permanent pacemaker electrodes through the subclavian vein. Although the facts in this case are complicated, no facts material to the resolution of defendant's motions are in dispute.

The original plaintiff in this action was Dr. Philip O. Littleford, a cardiologist on the staff of Florida Hospital South in Orlando, Florida. After Dr. Littleford's death in August 1984, H. Richard Bates, the personal representative of Dr. Littleford's estate, was substituted as the plaintiff. During the years prior to 1977, Dr. Littleford developed a method and associated equipment for insertion of permanent pacemaker electrodes through the subclavian vein. One of the major features of Dr. Littleford's invention is the use of split, peel-away sheath for insertion of the electrodes. His research on this project was conducted at Florida Hospital South and in his Orlando offices. In the fall of 1977, Dr. Littleford reached an oral agreement concerning his technique and apparatus with Larry Junker, a medical device sales representative from Clearwater, Florida. Under the terms of this oral agreement, Dr. Littleford was to clinically evaluate his invention and Medical Life Systems, Inc. (Junker's company), was to seek to market the related apparatus. Dr. Littleford applied for a patent for his inventions on December 13, 1977. Affidavit of Philip O. Littleford, M.D. at 1–3, Ex. 1.

The first surgical use of Dr. Littleford's invention was performed by Dr. David

Spector in December, 1977, at Florida Hospital South. Affidavit of Philip O. Littleford, M.D. at 2, Ex. 2. Extensive clinical evaluation of Dr. Littleford's apparatus began in January, 1978 and continued through late July, 1978. Although a small number of evaluations were performed at a number of hospitals including Miami Heart Institute in Miami, Florida, Lakeland General Hospital in Lakeland, Florida, and Winter Park Hospital in Winter Park, Florida, the majority of the evaluations were performed at Florida Hospital South in Orlando, Beth-Israel Medical Center in Newark, New Jersey (NBIMC), and St. Thomas Hospital in Nashville, Tennessee. *See* Affidavit of Philip O. Littleford, M.D., Ex. 3–205.

Defendant Cook, Inc. (Cook) is a corporation organized and incorporated under the laws of Indiana which has its principal place of business at Bloomington, Indiana. Affidavit of Brian Bates at 1. In mid-December, 1977, Larry Junker telephoned Brian Bates, the Manager of Marketing for Cook, at Cook's Indiana offices. Deposition of Brian Bates, June 28, 1984 at 23–26. Junker's call was not solicited by Cook or Bates. During this conversation, Junker described Dr. Littleford's technique and the necessary equipment, particularly the peel-away sheath, to Bates. Deposition of Brian Bates at 24–25.

In response to this call, Bates sent Junker several conventional, non-peel-away sheaths. Deposition of Brian Bates at 23, 46–47. Junker sent a letter from Florida dated December 26, 1977 to Bates in Indiana reiterating Dr. Littleford's procedure and necessary equipment. Junker enclosed a set of drawings of the equipment and the insertion technique. Deposition of Brian Bates at 47, plaintiff's Ex. 7. Junker sent the December 26, 1977, letter before receipt of the samples sent in response to his earlier call. Deposition of Brian Bates at 48.

On January 9, 1978, Bates wrote to Junker regarding the feasibility of manufacturing an introducer set for placement of permanent pacemaker electrodes and indicated that sample sets were being forwarded. Deposition of Brian Bates at 56–62, Ex. 8. Bates again wrote to Junker concerning the introducer sets on March 1, 1978, and also sent introducer sets with tear-away sheaths. Deposition of Brian Bates at 65, Ex. 10. Junker and Bates then met briefly at a trade show in Anaheim, California, where problems with the sheath wall thickness were likely discussed. Deposition of Brian Bates at 72–73. In May, 1978, Bates called Junker to check the progress on the introducer set project and was informed that Junker was not satisfied with the Cook design and was working with another party in the development of the desired introducer sets. Deposition of Brian Bates at 79–80.

Also sometime in May, 1978 Bates was contacted by Jean Linn, the nurse in charge of the cardiac catheter laboratory at NBIMC, concerning the possibility of Cook's supplying introducer sets similar to samples supplied to NBIMC by Junker. Deposition of Brian Bates at 85–58; Deposition of Jean Linn at 12,31. Ms. Linn's call to Cook also was not solicited by Cook or Brian Bates. Samples of the sets supplied by Junker were sent to Cook by Ms. Linn. *See* Deposition of Brian Bates at 84–85; Deposition of Jean Linn at 14–15. After initially being contacted by Ms. Linn, Bates corresponded with Dr. Victor Parsonnet of NBIMC through the remainder of 1978 concerning the proper construction of the split-sheath introducer sets which could be peeled away. Deposition of Brian Bates at 93 *et seq.;* Deposition of Dr. Victor Parsonnet, at 29 *et seq.* Dr. Parsonnet, a prominent cardiovascular surgeon, was participating in the clinical evaluation of Dr. Littleford's technique and apparatus, and earlier had attempted unsuccessfully to develop such an apparatus himself. Deposition of Dr. Parsonnet at 3–6.

On August 24, 1978, Dr. Littleford, through his attorney, informed Bates that he considered Cook's activities in testing their pacemaker electrode introducer set a breach of confidence as to information supplied to Cook by Junker. Defendant's

Memorandum in Support of Motion for Summary Judgment, Ex. F. Nevertheless, Cook began manufacturing and publicly marketing its peel-away introducer sheath during approximately September of 1978. Affidavit of Brian Bates at 2. In October, 1978, Larry Junker's company was terminated as licensee for Dr. Littleford's invention. Affidavit at of Dr. Littleford at 4. The United States Commissioner of Patents and Trademarks issued United States Letters Patent 4,166,469 to Dr. Littleford for his invention on September 4, 1979. Defendant's Memorandum in Support of Motion for Summary Judgment, Ex. A. at 1118 (Complaint in Case No. 79–447–CIV–ORL–Y). Dr. Littleford admitted that he knew in October 1978 that Cook was manufacturing commercial kits allegedly incorporating his designs. Affidavit of Dr. Littleford at 5.

The events surrounding the development and marketing of Dr. Littleford's invention led to numerous suits in various courts. In 1979, two suits were filed in state court by Larry Junker and his associated companies against Dr. Littleford. In *Junker v. Littleford*, Circuit Civil No. 79–3451–16, Sixth Judicial Circuit, Larry Junker claimed co-inventorship of Dr. Littleford's patent. An opinion and final judgment were entered in that case in favor of Dr. Littleford by Judge Charles M. Phillips on October 19th, 1979. *See* Plaintiff's Memorandum in Opposition to Defendant's Motion for Sanctions. In the second case, *Introstat, Inc. v. Littleford*, Circuit Civil No. 79–3452–16, Sixth Judicial Circuit, Introstat Inc. (Introstat), the assignee of Medical Life Systems, Inc. (Med. Life), alleged that Dr. Littleford improperly terminated the licensing agreement. Dr. Littleford counterclaimed against Introstat and sued Med. Life for, *inter alia*, breach of the license agreement and rescission. After an October 31, 1980, jury verdict against Introstat on its specific performance claim and for Dr. Littleford on his breach of the license agreement counterclaim, final judgment was entered in accordance with the jury verdict on December 16, 1980. Final Judgment as to the damages recoverable by Dr. Littleford was entered on January 8, 1981. Plaintiff's Memorandum in Opposition to Motion for Sanctions, Ex. D, E, H, I, and J.

In one of the counterclaim counts for rescission in *Introstat, Inc. v. Littleford*, Dr. Littleford alleged that Junker disclosed the introducer process to three or more potential manufacturers, including Cook, without attempting to obtain the customary signed confidentiality agreement. Dr. Littleford further alleged that before entering into the licensing agreement, Med. Life had a duty to disclose to Dr. Littleford that it had made the disclosures of Dr. Littleford's invention to potential manufacturers. Dr. Littleford claimed he was entitled to rescission because of Med. Life's failure to report its disclosures. Plaintiff's Memorandum in Opposition to Motion for Sanctions, Ex. D. In a letter filed October 31, 1980, Judge Phillips indicated that because Dr. Littleford had not required a non-disclosure document from Larry Junker, Dr. Littleford was not entitled to rescind the licensing agreement. Judge Phillips stated in part:

> It is necessarily Littleford's position that from the outset he considered himself the inventor and rightful patent owner. Regardless of the consideration that Littleford at the early stages trusted Junker, still he required no disclosure document from Junker when laying out to him the entire apparatus and procedure. Then Junker recognizing the commercial value of the apparatus attempted to get a head start and to capture a piece of the action by making a disclosure to Cook without any protection whatsoever. In the days before patent protection was secured, he had a legal, if not equitable, right to make this revelation because he had not bound himself to a disclosure agreement with Littleford.

Plaintiff's Memorandum in Opposition to Sanctions, Ex. B. At the end of this letter, Judge Phillips requested an Order denying relief to Littleford on the counterclaim for rescission. *Id.* However, unlike other claims in this suit, no such order was submitted or entered, and final judgment was

never entered on the rescission counterclaim. *See* plaintiff's Memorandum in Opposition to Motion for Sanctions and Ex. M–N; Certified Copy of Docket Sheet, *Introstat, Inc. v. Littleford,* Circuit Civil No. 79–3452–16.

Dr. Littleford brought suit against Cook and a customer, Mercy Community Hospital in this Court in September 1979. In *Littleford v. Mercy Community Hospital,* Case No. 79–447–ORL–CIV–Y, Dr. Littleford sought relief on counts of patent infringement against Mercy Community Hospital, misappropriation of trade secrets and head start against Cook, unfair competition for disparagement and slander of title, false designation of origin and monopolization or attempted monopolization. Defendant's Memorandum in Support of Motion for Summary Judgment, Ex. A (Complaint, Case No. 79–447–ORL–CIV–Y). In an Order filed September 19, 1980, Chief Judge Young granted defendant's motion to transfer to the Southern District of Indiana. Defendant's Memorandum in Support of Motion for Summary Judgment, Ex. B. Upon plaintiff's motion, Case No. 79–447–ORL–CIV–Y was dismissed without prejudice on November 25, 1980.

In October, 1980, Cook filed suit in the United States District Court, Southern District of Indiana, seeking a declaratory judgment of patent invalidity and non-infringement concerning Dr. Littleford's invention. However, that action was dismissed for lack of personal jurisdiction over the defendants, Dr. Littleford and Devices for Medicine, Inc., on February 25, 1982. *See* Plaintiff's Memorandum in Opposition to Defendant's Motion for Transfer, Ex. A.

On July 13, 1982, Dr. Littleford filed this suit against Cook for misappropriation of trade secrets and head start in Florida state court. Defendant subsequently removed the action to this Court. Defendant's renewed Motion to Transfer was denied on December 10, 1982, because plaintiff in the present complaint merely asserts an action for activities prior to Dr. Littleford's patent, thus distinguishing this suit from the prior action which was ordered

transferred because it essentially involved the validity of the patent itself. On May 3, 1984, the case was set for trial during the term commencing July 16, 1984. Defendant filed its motion for summary judgment on statute of limitations grounds on June 19, 1984. Defendant filed its motion for leave to file amended answer and counterclaim and its motion for summary judgment on collateral estoppel grounds on July 12, 1984. Defendant also moved for sanctions on July 16, 1984, alleging that plaintiff's counsel had failed to produce Judge Phillips letter opinion in response to its requests for discovery. Oral argument was heard on these motions on July 23, 1984.

## CONCLUSIONS OF LAW

### A. Motion for Sanctions

■ Defendant has moved for sanctions against plaintiff for "plaintiff's wanton and reckless pursuit of a knowingly groundless suit, and plaintiff's withholding of critical evidence having the effect of barring the present action." The gravamen of defendant's motion is that the letter opinion of Judge Phillips in *Introstat, Inc. v. Littleford* (*Introstat* litigation) collaterally estops plaintiff in this action, and that plaintiff wrongfully withheld production of the letter opinion in response to defendant's written and oral discovery requests.

The record in this case and in the earlier action in this Court indicates that counsel for defendant has been aware of the *Introstat* litigation and its potential collateral estoppel effects since at least 1980. Defendant took the deposition of Larry Junker in February of 1980, and received a copy of the Supplement to Motion for Reconsideration filed in September 1980 in *Littleford v. Doctors Mercy Hospital, Ltd.,* Case No. 79–447–Orl–Civ–Y, which raised the issue of the potential collateral estoppel effects of the *Introstat* counterclaim. In fact, defendant now argues that plaintiff is equitably and judicially estopped from denying the collateral estoppel effects of Judge Phillips' letter opinion by the discussion of collateral estoppel in that Supple-

ment to Motion for Reconsideration. Thus, defendant clearly had notice of the *Introstat* litigation and its possible collateral estoppel effects well in advance of the independent investigation of the *Introstat* court file which defendant ultimately conducted in July 1984.

On June 8, 1984 defendant made its first request for production of documents in preparation for the scheduled July 16, 1984 trial in this action. Despite the notice of the *Introstat* litigation and its potential collateral estoppel effects, none of defendant's general discovery requests is calculated to require production of documents relating to Count II of Dr. Littleford's counterclaim against Introstat. Although plaintiff might have objected formally to the request for production of documents on the grounds that the requested document production was outside the time permitted by the Court's pretrial order, plaintiff agreed to and did produce a number of documents before the scheduled close of discovery on July 2, 1984. During a July 6, 1984 telephone conference, counsel for defendant requested production of materials relating to the trial proceedings between Dr. Littleford and Junker in 1980. Plaintiff responded to this untimely oral request by producing documents relating to Junker's claim against Dr. Littleford and to Count I of Dr. Littleford's counterclaim, but plaintiff did not produce any documents related to Count II of the counterclaim. However, in his affidavit submitted in response to defendant's motion for sanctions, counsel for plaintiff indicated that counsel for defendant merely asked for a copy of any final judgment or verdict rendered in the *Introstat* litigation, and that these were provided to defendant's local counsel. Affidavit of Herbert Allen at 2–3. Judge Phillips' letter opinion was not supplied because counsel for plaintiff did not regard it as within defendant's request for a final judgment or verdict. Affidavit of Herbert Allen at 4.

In light of the foregoing facts, defendant's motion for sanctions must be DENIED. Defendant had notice of the *Introstat* litigation and of its potential collateral estoppel effects in advance of the scheduled trial. In fact, defendant had notice of these matters in advance of the institution of this suit. Furthermore, the record indicates that plaintiff complied with defendant's discovery requests. Therefore, defendant's motion for sanctions is without merit.

## B. Motion to Amend

On July 12, 1984, defendant moved for leave to file an amended answer to assert collateral estoppel as a defense and to assert a counterclaim for malicious prosecution. As defendant correctly stated, Federal Rule of Civil Procedure 15 provides that a party may amend pleadings at any time with leave of court, and that leave should be given freely when justice so requires. Clearly, the issue to be decided on this motion is whether justice requires that permission to amend be granted in this case.

The Supreme Court set forth the standard to be applied in deciding a motion to amend in *Foman v. Davis*, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). In *Foman*, the Court indicated that leave to amend should be freely given in the absence of reasons for denial such as "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." *Id.* at 182, 83 S.Ct. at 230; *see also Local 472 of the United Ass'n. of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada v. Georgia Power Company*, 684 F.2d 721, 724 (11th Cir.1982). The former Fifth Circuit has indicated that "amendments should be tendered no later than the time of pretrial, unless compelling reasons why this could not have been done are presented", and that the trial judge's decision on a motion to amend "must weigh good cause shown for the delay in moving, *vis a vis* dilatoriness of counsel resulting in last minute surprise and inability of opposing counsel to meet the tendered issue." *Nevels v. Ford Motor Company*, 439 F.2d 251, 257

(5th Cir.1971); *see Evans v. Syracuse City School District*, 704 F.2d 44, 47 (2d Cir. 1983).

▪ Under the *Foman* standard, as explicated in *Nevels*, defendant's motion to amend must be denied. Defendant's motion to amend was filed two years after the institution of the suit, after the close of discovery and the filing of the pretrial stipulation, and just four days prior to the commencement of the scheduled trial term. Although defendant claimed that the collateral estoppel defense was newly discovered, counsel for defendant had notice of the potential collateral estoppel effects of the *Introstat* litigation prior to the filing of this suit. Thus, defendant's last minute assertion of the collateral estoppel defense was both dilatory and unduly delayed, although bad faith has not been shown. In part, the prejudice to plaintiff arising from the untimeliness of this motion has been obviated by the continuance of this case in order to decide this and other motions. *See Bamm, Inc. v. GAF Corporation*, 651 F.2d 389, 391 (5th Cir. Unit B 1981). However, plaintiff has been prejudiced by the continuance of this matter and the necessity of preparing for the collateral estoppel issue rather than for the defenses and issues timely raised.

Finally, the motion to amend must be denied because amendment to add the collateral estoppel defense and malicious prosecution counterclaim would be futile. *See Moore v. Balkcom*, 716 F.2d 1511, 1526–1527 (11th Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 1456, 79 L.Ed.2d 773 (1984); *see also Scoggins v. Moore*, 579 F.Supp. 1320, 1322 (N.D.Ga.1984). As discussed below, *infra* at 670–673, defendant's collateral estoppel defense lacks merit under the applicable law. Furthermore, defendant's proposed claim against plaintiff for malicious prosecution of this case fails because such a claim is premature at this stage of the proceedings. As the court in *Bieley v. duPont, Glore, Forgan, Inc.*, 316 So.2d 66. (Fla.3d Dist.Ct.App.1975) indicated:

There are six elements required to sustain an action for malicious prosecution, one of which is bona fide termination of the prior action in favor of the plaintiff in the malicious prosecution action. If any of the elements is lacking, the result is fatal to the action. (citation omitted). A counterclaim for malicious prosecution or abuse or process cannot be maintained in a pending action since the abuse claimed is the pending suit which cannot be said to have terminated in favor of the counterclaimant. (citation omitted).

*Id.* at 67; *see also Blue v. Weinstein*, 381 So.2d 308, 311 (Fla. 3d Dist.Ct.App.1980) (dictum); 24 Fla.Jur.2d False Imprisonment and Malicious Prosecution § 14 (1981). Thus, plaintiff's amendment of the pleadings to assert a counterclaim for malicious prosecution of this action would be futile.

In summary, defendant's motion to amend the answer to assert a new affirmative defense and add a counterclaim is DENIED because the motion has been unduly delayed without good cause, has prejudiced plaintiff in the preparation of his case and would be futile.

C. Collateral Estoppel

Even had plaintiff been permitted to amend its complaint to add collateral estoppel as an affirmative defense, defendant's motion for summary judgment based thereon fails on the merits. In its motion for summary judgment on collateral estoppel grounds, defendant asserts that plaintiff is collaterally estopped from asserting his trade secret claim by the letter opinion of Judge Phillips in the *Introstat* litigation. In that letter opinion, Judge Phillips indicated that Junker did not receive plaintiff's trade secrets in confidence. Defendant also argues that plaintiff is equitably and judicially estopped by its prior representation in a pleading submitted to this Court that the decision in *Introstat* might have a collateral estoppel effect.

▪ The initial issue is whether federal or state law must be applied in determining the preclusive effect of the state court decision in *Introstat*. Although federal com-

mon law principles apply if the prior determination was rendered in a federal action, state law governs whether a prior state court decision bars a subsequent federal diversity action. *See, e.g., Precision Air Parts, Inc. v. Avco Corporation,* 736 F.2d 1499, 1503 (11th Cir.1984); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Haydu,* 637 F.2d 391, 398 (5th Cir. Unit B. 1981); *Hicks v. Quaker Oats Company,* 662 F.2d 1158, 1166 (5th Cir. Unit A 1981); The former Fifth Circuit cases relied upon by defendant involved the preclusive effects given by federal courts to the judgments of other federal courts. *See Rufenacht v. Iowa Beef Processors, Inc.,* 656 F.2d 198, 202 (5th Cir. Unit A 1981); *cert. denied,* 455 U.S. 921, 102 S.Ct. 1279, 71 L.Ed.2d 462 (1982); *Johnson v. United States,* 576 F.2d 606, 613 (5th Cir.1978). Judge Phillips' letter opinion was issued in a Florida state court action. Therefore, this Court must apply Florida law in determining the preclusive effect of the letter opinion.

The requirements for collateral estoppel under Florida law were set forth by the Supreme Court of Florida in *Mobil Oil Corporation v. Shevin,* 354 So.2d 372 (Fla. 1977);

> Collateral estoppel or estoppel by judgment, is a judicial doctrine which in general terms prevents identical parties from relitigating issues that have previously been decided between them. The essential elements of the doctrine are that the parties and issues be identical, and that the particular matter be fully litigated and determined in a contest which results in a final decision of a court of competent jurisdiction.

*Id.* at 374 (footnotes omitted). Florida courts continue to require all of these elements. *See, e.g., United States Fidelity & Guaranty Company v. Odoms,* 444 So.2d 78, 79–80 (Fla. 5th Dist.Ct.App.1984).

■ Since defendant was not a party in *Introstat,* the requirement that the parties be identical has not been met. In its memorandum and at oral argument, defendant argued strenuously that this identity of parties, or mutuality, requirement is out-

dated and should not be applied in this case, which involves the defensive use of collateral estoppel. However, earlier this year the Florida Supreme Court reaffirmed the mutuality requirement in the face of contrary authority in federal and other state courts, stating:

> We recognize that the federal courts have abandoned the requirement of mutuality of parties as a prerequisite to asserting the doctrine of collateral estoppel. *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979); *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation,* 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971). We are also aware that other jurisdictions have also receded from the mutuality requirement. *See, e.g., Bernhard v. Bank of America National Trust & Savings Association,* 19 Cal.2d 807, 122 P.2d 892 (1942). However, the well established rule in Florida has been and continues to be that collateral estoppel may be asserted only when the identical issue has been litigated between the same parties or their privies. *Mobil Oil Corp. v. Shevin,* 354 So.2d 372 (Fla.1977); *Universal Construction Co. v. City of Ft. Lauderdale,* 68 So.2d 366 (Fla.1953).

*Trucking Employees of North Jersey Welfare Fund, Inc. v. Romano,* 450 So.2d 843, 845 (Fla.1984). In *Romano,* the plaintiffs sought to use defendant's prior federal conviction to establish the truth of the factual allegations in the civil suit for purposes of res judicata and collateral estoppel. *Id.* at 844. The Florida Supreme Court held that a litigant who was not a party to a prior criminal proceeding cannot use a judgment of conviction offensively in a civil proceeding to prevent the same defendant from relitigating issues resolved in the earlier criminal proceeding. *Id.* at 845–46.

Although *Romano* involved the offensive use of collateral estoppel, the Court is unwilling to permit the defensive use of collateral estoppel in this case because of the Florida Supreme Court's unequivocal and unconditional affirmance of the mutuality

requirement. Although *Romano* can be distinguished from the instant case, the Florida Supreme Court gave absolutely no indication that it might view the mutuality requirement differently in a defensive collateral estoppel context. Therefore, the Court concludes that mutuality remains a requirement for collateral estoppel under Florida law.

■ Defendant contends that even if mutuality is required, collateral estoppel should be applied in this case because defendant falls within the derivative and successor exceptions to the identical parties rule. Under Florida law, where non-parties are in privity with a party, participate in a prior action or are virtually represented by the party, they may be bound by the decision in the prior action. *See, e.g., Hinton v. Iowa National Mutual Insurance Company*, 317 So.2d 832 (Fla. 2d Dist.Ct.App. 1975), *cert. denied*, 328 So.2d 842 (Fla. 1976); *Kline v. Heyman*, 309 So.2d 242 (Fla. 2d Dist.Ct.App.), *cert. denied*, 317 So.2d 767 (Fla.), *cert. denied*, 423 U.S. 1034, 96 S.Ct. 567, 46 L.Ed.2d 408 (1975). However, defendant does not appear to fall within any of these exceptions. To the extent that determination of whether any of these exceptions should apply is a question of fact, defendant has failed to produce any facts to show that it falls within the exception, much less sufficient facts to carry its burden on summary judgment motion. Therefore, defendant has not shown that it fits within any of the exceptions to the mutuality requirement.

■ In addition, defendant's collateral estoppel defense is without merit because the letter opinion of Judge Phillips was not a final decision as required by Florida law. *See Mobil Oil Company v. Shevin*, 354 So.2d at 374. As the Fifth Circuit has acknowledged, "[u]nder Florida law, a former judgment is deserving of res judicata or collateral estoppel effect only if it qualifies as a final judgment." *Merrill Lynch, Pierce, Fenner, & Smith, Inc. v. Haydu*, 637 F.2d at 397 (citations omitted); *see Poinciana Chinaware, Inc. v. Forsythe*, 136 So.2d 337, 339–340 (Fla.1961); 32 Fla.

Jur.2d Judgments and Decrees § 127 (1981). Judge Phillips' letter opinion, which clearly contemplated further action by the parties and the court before it became final, does not satisfy the requirement under Florida law of a final decision. Because the letter opinion in the *Introstat* litigation fails to meet the mutuality and final decision requirements for collateral estoppel, the Court need not address whether or not the *Introstat* litigation involved identical issues which were fully litigated, the remaining requirements for collateral estoppel under Florida law.

■ In its memorandum in support of the motion for summary judgment on collateral estoppel grounds, defendant also argues that plaintiff is judicially and equitably estopped from denying that he is collaterally estopped because of plaintiff's acknowledgment in a motion in the prior suit in this Court of the potential collateral estoppel effect of the *Introstat* litigation. Initially, the Court notes that these judicial and equitable estoppel defenses were not included in the motion to amend the complaint to add an affirmative defense. Thus, these defenses are not properly before the Court and could not be the basis for summary judgment.

■ In addition, these defenses fail on their merits. By defendant's own admission, equitable estoppel requires that the party asserting the estoppel has detrimentally relied upon a prior inconsistent and successful position of the party against whom the estoppel is sought. *See Tuveson v. Florida Governor's Council on Indian Affairs, Inc.*, 734 F.2d 730, 735 (11th Cir. 1984); *Edwards v. Aetna Life Insurance Company*, 690 F.2d 595, 598 (6th Cir.1982). The issue of detrimental reliance is fact oriented, and is not appropriate for summary judgment in this case. The doctrine of judicial estoppel "is designed to prevent parties from making a mockery of justice by inconsistent pleadings." *American National Bank of Jacksonville v. Federal Deposit Insurance Corporation*, 710 F.2d 1528, 1536 (11th Cir.1983). This doctrine ordinarily is applied only to sworn posi-

tions, *id.* at 1536; 1 B Moore's Federal Practice para. 4.05[8] (1982), but generally not to legal conclusions. 1B Moore's Federal Practice para. 4.05[8]. Thus, application of this doctrine to plaintiff's discussion in a *motion* of the potential collateral estoppel consequences of other litigation, *i.e.,* a legal conclusion, would be inappropriate. Furthermore, the majority view is that judicial estoppel does not apply unless a party has been successful in persuading a court to accept its position. *See Edwards v. Aetna Life Insurance Company,* 690 F.2d at 599; *USLIFE Corporation v. U.S. Life Insurance Company,* 560 F.Supp. 1302, 1303, 1305–06 (N.D.Tx.1983). Neither the Eleventh Circuit nor the former Fifth Circuit has specifically addressed the issue of whether prior success is an essential element of the judicial estoppel doctrine. The Court concludes that a requirement of prior success is the better view. A review of the supplement to motion for reconsideration shows that plaintiff raised the potential collateral estoppel effects of the *Introstat* litigation in an effort to persuade the Court to stay the action, and that plaintiff requested dismissal of the action only if the Court declined to grant a stay. Thus, it appears that plaintiff was unsuccessful in persuading the Court to accept its collateral estoppel argument. Therefore, judicial estoppel would be inappropriate in this case. Defendant's argument that it is entitled to summary judgment because plaintiff is judicially and equitably estopped from denying the collateral estoppel effect of the *Introstat* litigation is without merit.

## D. Statute of Limitations

Defendant moved for summary judgment on the grounds that plaintiff's suit is barred by the two year Indiana statute of limitations applicable to actions for injuries to personal property. Defendant's motion for summary judgment was based solely upon the Indiana two year statute of limitations. Therefore, defendant's subsequent assertion at oral argument and in supplementary memoranda that plaintiff's suit is also barred by the applicable four year Florida statute of limitations will not be addressed or relied upon in this decision.

## (1) Summary Judgment Standards

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." As the moving party, defendant bears an exacting burden of showing the non-existence of any material fact, *Warrior Tombigbee Transportation Company v. M/V Nan Fung,* 695 F.2d 1294, 1296 (11th Cir.1983), and defendant must establish an adequate legal basis for the Court to apply the proper legal principles. *Bingham, Ltd. v. United States,* 724 F.2d 921, 924 (11th Cir.1984). Viewing the evidence and inferences in the light most favorable to plaintiff, the party opposing the motion for summary judgment, *Thrasher v. State Farm Fire and Casualty Company,* 734 F.2d 637, 639 (11th Cir.1984); *Bingham, Ltd. v. United States,* 724 F.2d at 924; *Clemons v. Dougherty County, Georgia,* 684 F.2d 1365, 1369 (11th Cir.1982), and resolving all reasonable doubts in plaintiff's favor, *Warrior Tombigbee Transportation Company v. M/V Nan Fung,* 695 F.2d at 1296; *Impossible Electronics Techniques, Inc. v. Wackenhut Protective Systems, Inc.,* 669 F.2d 1026, 1031 (5th Cir. Unit B 1982); *Kennett-Murray Corporation v. Bone,* 622 F.2d 887, 892 (5th Cir.1980), the Court finds that there is no genuine issue as to any material fact. Thus, summary judgment is appropriate in this misappropriation of trade secrets case if plaintiff's suit is barred by the applicable statute of limitations. *See Avco Corporation v. Precision Air Parts, Inc.,* 676 F.2d 494, 495–96 (11th Cir.1982).

## (2) Substantive law

### (a) The applicable state law

The critical issue raised by defendant's motion for summary judgment on

statute of limitations grounds is which state's statute of limitations should be applied. Defendant argues that Indiana's two year statute of limitations should be applied, while plaintiff contends that Florida's four year statute is applicable. In determining which state law governs an action, a federal district court sitting in diversity must apply the conflicts of laws principles of the forum state. *Klaxon Company v. Stentor Electrical Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Acme Circus Operating Company v. Kuperstock*, 711 F.2d 1538, 1540 (11th Cir.1983). Florida regards statutes of limitations as matters of procedure which are governed by the law of the forum state. *See Colhoun v. Greyhound Lines, Inc.*, 265 So.2d 18, 20 (Fla.1972); *Pledger v. Burnup & Sims, Inc.*, 432 So.2d 1323, 1329 (Fla. 4th Dist.Ct.App.1983), *pet. for rev. den.*, 446 So.2d 99 (Fla.1984). Under Florida law, however, foreign statutes of limitations are borrowed in certain situations. Florida Statutes § 95.10 provides:

> When the cause of action arose in another state or territory of the United States, or in a foreign country, and its laws forbid the maintenance of the action because of lapse of time, no action shall be maintained in this state.

Fla.Stat. § 95.10 (1982) (§ 95.10). Section 95.10 bars actions brought in Florida which would have been time-barred if commenced at the same time in the jurisdiction where the cause of action arose. *See Beasley v. Fairchild Hiller Corporation*, 401 F.2d 593, 596 (5th Cir.1968). Thus, the critical issue in determining which statute of limitations to apply under § 95.10 is ascertaining where the cause of action for misappropriation of trade secrets arose.

Initially, the Court must decide which conflict of laws standard to apply in determining where a cause of action arises under § 95.10. Although Florida law clearly governs the choice of a conflict of law standard, *supra* at 10, the conflict of laws principle applicable under the Florida borrowing statute is not so clear. Until the Florida Supreme Court decision in *Bishop v. Florida Specialty Paint Company*, 389 So.2d 999 (Fla.1980), adopted the "most significant relationships" test set forth in the Restatement (Second) of Conflict of Laws § 145 (1971), Florida followed the *lex loci delicti* rule of conflicts of law, i.e. the law of the place of the wrong was applied. The parties in this case agree that the recently adopted "most significant relationships" test should be applied to determine where the cause of action arose for purposes of § 95.10. However, in *Pledger v. Burnup & Sims, Inc.*, 432 So.2d at 1329–31, the Florida Fourth District Court of Appeals squarely faced the question of whether a cause of action arises for purposes of § 95.10 in the state with the most significant relationship or in the state where the wrong occurred. In *Pledger, id.* at 1330, the Court stated that Florida unquestionably had the most significant contacts and relationship, but that New York was the place of the wrong. The claim in question was time-barred under New York law, but not Florida law. The *Pledger* court acknowledged that the *Bishop* decision adopted the significant relationships conflict of laws rule for choice of substantive law, but distinguished *Bishop* on the grounds that § 95.10 pertains to statutes of limitations and is thus a procedural statute. Noting that the legislative purpose of § 95.10 is to require vigilance and that the Florida legislature has given no indication that the *Bishop* test should be applied to determine when a cause of action arises under § 95.10, the court in *Pledger* stated:

> The language of Restatement (Second) § 145, as adopted in *Bishop*, clearly refers to rights and liabilities, not to remedies. That is, *Bishop* determines which state's substantive law will apply, notwithstanding where the cause of action accrued. We decline to "give a strained construction to evade the effect" of the statute in the absence of a statement of legislative will or a ruling by our Supreme Court. We hold that the cause of action stated in Count IV of Appellant's defamation complaint is barred by operation of Section 95.10 Florida Statutes

(1981) and CPLR Section 215, the New York Statute of Limitations.

*Pledger v. Burnup & Sims, Inc.*, 432 So.2d at 1330.

Thus, Florida courts continue to apply the rule of *lex loci delicti* to determine when a cause of a action arises for purposes of § 95.10. In applying similar borrowing statutes, some states have chosen to consider a foreign state's statute of limitations as part of the foreign state's substantive law and to apply a foreign state's statute of limitations whenever the foreign state's substantive law would be applied to the merits of the action. *See Henry v. Richardson-Merrell, Inc.*, 508 F.2d 28, 32 (3rd Cir.1975) (New Jersey); *Dymond v. National Broadcasting Company*, 559 F.Supp. 734, 736 (D.Delaware 1983). However, the Florida Fourth District Court of Appeals has construed Florida law and legislative intent to require application of a different conflict of laws standard for determining where a cause of action arises under the procedural borrowing statute than would be applied in determining the applicable substantive law.

■■■ The parties have not argued that the *Pledger* court's interpretation of the Florida borrowing statute should not be followed by this Court, and "[i]n the absence of any persuasive indication that the state supreme court would hold otherwise, intermediate state appellate court decisions ... must be taken to reflect a valid interpretation of state law." *Bradbury v. Wainwright*, 718 F.2d 1538, 1540 (11th Cir. 1983) (citations omitted). Therefore, the conflict of laws standard for determining where a cause of action arose for purposes of § 95.10 is the rule of *lex loci delicti.*

Having decided that Florida law dictates the application under § 95.10 of *lex loci delicti*, the Court must determine the appropriate interpretation of the *lex loci delicti* rule in this case. The phrase *lex loci delicti* has been variously construed under § 95.10 to require application of the law of the place of injury, *Bishop v. Florida Specialty Paint Company*, 389 So.2d at 1000, the place of the wrong, *Pledger v. Burnup*

& *Sims, Inc.*, 432 So.2d at 1330, or the place where the tortious act occurred. *Beasley v. Fairchild Hiller Corporation*, 401 F.2d at 596; *Griffin v. Seaboard Coast Line Railroad Company*, 307 F.Supp. 741,742 (S.D.Fla.1969). In *Westerman v. Sears, Roebuck and Company*, 577 F.2d 873, 878 (5th Cir.1978), a case not decided under § 95.10, the Fifth Circuit construed *lex loci delicti* under Florida law as "the place where defendant's conduct causes the injurious effect." All of these cases except *Pledger* involved personal injuries and applied the law of the place where the plaintiff suffered the physical injury. In *Pledger*, a defamation action, the law of the place of publication was applied. Thus, the precise meaning of the *lex loci delicti* principle in a misappropriation of trade secrets case is unclear under Florida law.

■■■ The interpretation of the *lex loci delicti* principle in misappropriation of trade secrets cases in other jurisdictions is instructive, however. In such cases, the courts of other jurisdictions generally apply the law of the place of the wrong, which is defined as the place where defendant's breach of confidence, wrongful disclosure, or wrongful use occurred. *See Goldberg v. Medtronic, Inc.* 686 F.2d 1219, 1225 (7th Cir.1982) (Under Illinois law, the locus of the alleged wrong or where the benefit was obtained by the defendant governs); *Smith v. Dravo Corporation*, 203 F.2d 369, 373 (7th Cir.1953) (*id.*); *Crown Industries, Inc. v. Kawneer Company*, 335 F.Supp. 749, 761 (N.D.Ill.1971) (*id.*); *Davis v. General Motors Corporation*, 196 U.S. P.Q. (BNA) 218,221 (N.D.Ill.1977) (*id.*); *Cambridge Filter v. International Filter Company*, 548 F.Supp. 1301, 1305 (D.Nev. 1982) (Under Nevada law, the law of the place of the wrongful disclosure governs); *Eaton Corporation v. Appliance Valves Corporation*, 526 F.Supp. 1172, 1177–78 (N.D.Ind.1981) (In an Indiana action for a multistate tort, the law of the place of the tort, *i.e.* the wrong, governs); *National Instrument Laboratories v. Hycel, Inc.*, 478 F.Supp. 1179, 1181 (D.Del.1979) (Under Delaware law, "the wrong occurs where

the defendant misappropriates or misuses plaintiff's secret"); *Data General Corporation v. Digital Computer Controls, Inc.*, 188 U.S.P.Q. (BNA) 276, 283 (Del. Chanc.1975) (*id.*); *Sarkes Tarzian, Inc. v. Audio Devices, Inc.*, 166 F.Supp. 250, 260 (S.D.Cal.1958) (Under California law, the law of the place of the wrongful disclosure governs). These cases persuade the Court that under Florida law, the *lex loci delicti* standard should be interpreted as the place of the wrong in cases involving misappropriation of trade secrets.

██ The next issue is where the wrong occurred in this case. Plaintiff alleges that the trade secrets were disclosed to defendant in confidence. Thus, it is defendant's use of the trade secrets rather than the method by which the defendant obtained the trade secrets which is of critical importance in this case. The facts in this case reflect that plaintiff resides in Florida, the trade secrets were developed in Florida and were tested primarily in Florida, Tennessee and New Jersey, and the alleged confidential disclosure was made by interstate telephone calls and correspondence. In *Molinaro v. Birnbaum*, 201 U.S.P.Q. (BNA) at 95, the Court indicated that although the confidential disclosure was made during a telephone conversation between Connecticut and New York, the wrong was the breach of confidence which occurred in Massachusetts where the defendants used the confidential information to manufacture products. Thus, the fact that Junker disclosed plaintiff's trade secret during interstate telephone calls and correspondence does not require application of Florida law. The alleged wrong in this case is defendant's wrongful *use* of the trade secrets, rather than a wrongful procurement of the information. Defendant's alleged wrongful use occurred at defendant's Bloomington, Indiana principal place of business where the information was used to develop and manufacture defendant's version of

the Littleford introducer sets. Although a limited amount of defendant's use of the trade secrets in further developing their introducer sets arguably took place in New Jersey, the primary locus of defendant's wrongful use was in Indiana. Therefore, for purposes of § 95.10 the cause of action arose in Indiana where the wrong occurred, and the Indiana statute of limitations should be applied under § 95.10.[1]

██ Alternatively, the Court concludes that Indiana also has the most significant relationship to the occurrence and parties in this case. As noted above, the Supreme Court of Florida accepted the Restatement (Second) of Conflict of Law significant relationships test for the choice of substantive law in *Bishop v. Florida Specialty Paint Company*, 389 So.2d at 1000. Section 145 of the Restatement sets forth the standards guiding the choice of law for tort claims:

(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(a) the place where the injury occurred,

(b) the place where the conduct causing the injury occurred,

(c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

---

**1.** In *Goldberg v. Medtronic, Inc.*, 686 F.2d at 1225, a case with a strikingly similar factual background, the Seventh Circuit and the parties agreed that the applicable Illinois "law of the place where the alleged wrong was committed or the benefit was obtained" conflict of laws rule "would lead to application of the law of Minnesota, where Medtronic maintains its manufacturing and research facilities and where any breach or benefit would have occurred."

Restatement (Second) of Conflict of Laws § 145 (1971). The general choice of law principles are enumerated in § 6 of the Restatement:

(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

Restatement (Second) of Conflict of Laws § 6 (1971).

Consideration of the relevant contacts and factors under § 145 and § 6 leads to the conclusion that Indiana has the most significant relationship to the occurrence and parties in this action. In arguing that Florida has the most significant relationship, plaintiff has placed primary reliance on the first factor in § 145, the place where the injury occurred. Plaintiff has argued that the injury in this case is the damage or loss felt by plaintiff in Florida because of the use by defendant of plaintiff's trade secrets. Defendant at one time contended that the relevant injury was Cook's alleged misappropriation and unauthorized use of plaintiff's trade secrets in Indiana. Comments e and f of § 145, however, seem to indicate that the relevant injury in a case such as this is plaintiff's loss of sales.[2] This injury occurred nationwide and, indeed, worldwide. Where, as here, the injury occurred in two or more states, this contact does not play as important a role, and the place of defendant's conduct is given particular weight in determining which state's law is applicable. Restatement (Second) of Conflict of Laws § 145 comment f. Thus, the first factor, the place of injury, does not point to any particular state because the injury occurred in many states.

According to comment f to § 145, the second factor, the place where the conduct causing the injury occurred, is of pre-eminent importance in the type of case here in question. Comment f states in pertinent part:

[T]he place of injury is less significant in the case of fraudulent misrepresentations (see § 148) and of such unfair competition as consists of false advertising and the misappropriation of trade values. The injury suffered through false advertising is the loss of customers or of trade. Such customers or trade will frequently be lost in two or more states. The effect of the loss, which is pecuniary in its nature, will normally be felt most severely at the plaintiff's headquarters or principal place of business. But this place may have only a slight relationship to the defendant's activities and to the plaintiff's loss of customers or trade. The situation is essentially the same when misappropriation of the plaintiff's trade values is involved, except that the plaintiff may have suffered no pecuniary loss but the defendant rather may have obtained an unfair profit. For all these

---

2. Even if the place of plaintiff's loss or damages is considered the place of injury, this factor should not be given pre-eminent importance in an action for misappropriation of trade secrets. *See Walker v. University Books, Inc.,* 193 U.S. P.Q. (BNA) 596, 603 (N.D.Cal.1977) *rev'd on other grounds,* 602 F.2d 859 (9th Cir.1979). (In dictum, the court indicated that where plaintiff resided and maintained her business in Califor-

nia, defendants resided in New York, the parties met and negotiated in New York and the alleged acts of unfair competition took place entirely in New York, New York had the most significant relationship to any unfair competition, even though plaintiff arguably suffered damage in California and some defendants engaged in a nationwide publishing business).

reasons, the place of injury does not play so important a role for choice-of-law purposes in the case of false advertising and the misappropriation of trade values as in the case of other kinds of torts. Instead, the principal location of the defendant's conduct is the contact that will usually be given the greatest weight in determining the state whose local law determines the rights and liabilities that arise from false advertising and the misappropriation of trade values.

Restatement (Second) of Conflict of Laws § 145 comment f at 423–424. Plaintiff has shown no reason why plaintiff's Orlando residence, where the effect of the lost sales was felt most severely, has more than a slight relationship to defendant's worldwide activities or to plaintiff's loss of worldwide sales. Therefore, the place of defendant's conduct is entitled to the greatest weight among the § 145 factors in this case. *See Data Cash Systems, Inc. v. JS & A Group, Inc.*, 480 F.Supp. 1063, 1071 (N.D.Ill.1979), *aff'd on other grounds*, 628 F.2d 1038 (7th Cir.1980) ("In unfair competition cases the principal location of the defendant's conduct is the contact that is usually given the greatest weight in determining the state which has the most significant relationship," citing comment f).

The relevant place of defendant's conduct in this case is Indiana, where defendant used the trade secrets to develop and manufacture the product which incorporated plaintiff's trade secrets. Because plaintiff seeks relief for defendant's *misuse* of information allegedly disclosed in confidence, the issue of whether the interstate telephone calls and letters disclosing the trade secrets are Florida or Indiana contacts is of little significance. It is the location of defendant's alleged misuse of this confidential information which determines the place of defendant's conduct in this case. Furthermore, it is the *principal* place of defendant's conduct which is pertinent; thus, defendant's activities need not be exclusively in one state. Although some of the defendant's alleged misconduct in developing their version of the introducer sets is arguably connected with New Jersey as well as Indiana, the principal locus of defendant's conduct is in Indiana. Thus, the second factor, which is accorded the greatest weight in this case, points to the application of Indiana law.

The third factor is the domicile, residence, nationality, place of incorporation and place of business of the parties. Dr. Littleford was domiciled in Orlando, Florida and maintained his medical practice there. Defendant is incorporated under the laws of Indiana and maintains its principal place of business in Indiana. Comment e to § 145 indicates that the importance of this factor and these contacts depends largely upon the extent to which they are grouped with other contacts, and generally carries little weight of itself. Restatement (Second) of Conflict of Laws § 145 comment e at 421. This third factor does not appear to require application of either Florida or Indiana law and will be regarded as a neutral factor.

The fourth factor—the place where the relationship, if any, between the parties is centered—also is of little aid in ascertaining the applicable law. Of course, one of the critical issues in this case is whether or not a confidential relationship existed between the parties. Assuming, *arguendo*, that such a relationship existed, the place where the relationship was centered is difficult to determine because all of the contacts in building this relationship took place in states other than Indiana or Florida or by interstate communication. Equally forceful arguments may be made for placing the center of the alleged relationship in either state. Because this case does not present the type of situation where the place of the center of the relationship is of special importance, *see* Restatement (Second) of Conflict of Laws § 145 comment e at 421–422, the Court need not decide in which state the relationship is centered.

In summary, an assessment of the four factors listed in § 145 indicates that the law of the principal place of defendant's alleged wrongful conduct is the predominant contact. Under the general choice-of-

law principles enumerated in § 6, as evaluated through the assessment of the contacts listed in § 145, Indiana is the state with the most significant relationship to the occurrence and the parties. Thus, under the Restatement significant relationships test Indiana law should be applied in this case.

(b) Indiana law

The Court has determined that an Indiana statute of limitations must be applied under § 95.10. The test in ascertaining if this action is barred by Indiana's statute of limitations under § 95.10 is whether or not the action could have been maintained in Indiana at the time the suit was commenced in Florida. *Beasley v. Fairchild Hiller Corporation*, 401 F.2d at 956; *Brown v. Case*, 80 Fla. 703, 86 So. 684 (1920). Although Indiana also has a borrowing statute, the Indiana borrowing statute does not apply in this case.[3] An Indiana court would have applied an Indiana statute of limitations to this case had it been brought in Indiana state court or a federal court sitting in Indiana. *See Horvath v. Davidson*, 148 Ind.App. 203, 264 N.E.2d 328 (1970); *Albrecht v. Indiana Harbor Belt R. Company*, 178 F.2d 577, 578 (7th Cir.1949), *cert. denied*, 339 U.S. 949, 70 S.Ct. 804, 94 L.Ed. 1363 (1950);

*Dart Industries, Inc. v. Adell Plastics, Inc.*, 517 F.Supp. 9, 10 (S.D.Ind.1980).[4]

The next issue, therefore, is which Indiana statute of limitations is applicable in this misappropriation of trade secrets case. Initially, the Court notes that Indiana's new three year trade secrets statute of limitations does not apply to this case.[5] Under Indiana law, "[t]he applicable statute of limitations is determined by the nature or substance of the cause of action." *Monsanto Company v. Miller*, 455 N.E.2d 392, 394 (Ind.App.1983) (citation omitted). The nature of plaintiff's claim is a tort suit for damages for misappropriation of plaintiff's trade secrets. Plaintiff in this action has proceeded upon a tort theory, and in opposing defendant's motion, plaintiff has not argued that a contract limitations period should apply. Therefore, a tort statute of limitations period will be applied in this case.

Defendant has persuasively argued, and plaintiff does not dispute, that the applicable Indiana limitations period in actions for misappropriation of trade secrets is the injury to personal property statute. Trade secrets appear to be viewed as property under Indiana law. *See Donahue v. Permacel Tape Corporation*, 234 Ind. 398, 127 N.E.2d 235, 240 (1955); *In Re Uniservices, Inc.*, 517 F.2d 492, 496 (7th

**3.** The Indiana borrowing statute applies only "[w]hen a cause of action has arisen without this state against a nonresident defendant." Ind.Code Ann. § 34–1–2–6–(b) (Burn's 1971 & Supp.1984). Because Cook is an Indiana corporation with its principal place of business in Indiana, the Indiana borrowing statute would not require that Indiana courts look to the statute of limitations in the state where the cause of action arose. Thus, this Court need not consider whether or not Florida courts when applying Indiana statutes of limitation under § 95.10, would apply the Indiana borrowing statute, and, if so, whether or not the Indiana courts would view the cause of action in this dispute as having arisen in Florida.

**4.** In *Gianni v. Fort Wayne Air Service, Inc.*, 342 F.2d 621 (7th Cir.1965), the Seventh Circuit applied the conflict of laws standards for substantive matters in determining the applicable statute of limitations, rather than considering such statutes procedural and applying the law of the

forum. Even if Indiana considers statutes of limitation substantive and applies conflict of laws standards in determining which state's limitations period should be applied, the analysis in *Eaton Corporation v. Appliance Valves Corporation*, 526 F.Supp. at 1177, indicates that Indiana courts would apply an Indiana statute of limitations in this case.

**5.** Indiana has enacted the Uniform Trade Secrets Act, including the three year statute of limitations. Ind.Code Ann. § 24–2–3–1 to 24–2–3–8 (West Supp.1983). The effective date of the trade secrets statute is September 1, 1982. Ind. Code Ann. § 1–1–3–3 (Burns 1982 Replacement Vol.) This suit was filed on July 13, 1982. Because the statute of limitations in force at the time of suit governs, *Dodd v. Kiefer*, 416 N.E.2d 463, 465 (Ind.App.1981); *Walsh v. Halteman*, 403 N.E.2d 894, 895 (Ind.App.1980), the new three year trade secrets statute of limitations is not applicable in this case.

Cir.1975); *see also Westervelt v. National Paper & Supply Company,* 154 Ind. 673, 57 N.E. 552, 554 (1900) (dictum); *Eaton Corporation v. Appliance Valves Corporation,* 526 F.Supp. at 1177 (characterizing trade secrets as proprietary rights). The Indiana statute of limitations applicable to injuries to personal property provides in pertinent part:

> Sec. 2. The following actions shall be commenced within the periods herein prescribed after the cause of action has accrued, and not afterwards:
>
> > (1) For injuries to person or character, *for injuries to personal property,* and for a forfeiture of penalty given by statute, within *two (2) years.*

Ind.Code Ann. § 34–1–2–2 (West 1983) (emphasis added).

In construing § 34–1–2–2, "Indiana Courts have consistently viewed 'personal property' in its broad and natural sense and have rebuffed arguments for a narrow and technical interpretation of the term." *Shideler v. Dwyer,* 275 Ind. 270, 417 N.E.2d 281, 287 (1981). This section "is not to be limited only to direct injuries to chattels, but also incorporates violations to a person's rights and interests in or to such property." *Rush v. Leiter,* 149 Ind.App. 274, 271 N.E.2d 505, 508 (1971); *Shideler v. Dwyer,* 417 N.E.2d at 287. Thus, plain-

tiff's action for damages for injuries to his rights and interests in trade secrets would be encompassed by the two year injury to personal property limitation period.

(c) Continuing Tort Theory

Because the Indiana two year limitations period applies, plaintiff's claim is barred unless it accrued after July 13, 1980, *i.e.* two years prior to the filing of this suit on July 13, 1982. Defendant's alleged use of plaintiff's trade secrets took place beginning in 1978 and 1979, well before this suit was filed in 1982. However, plaintiff argues that misappropriation of trade secrets is a continuing tort under Florida law, *Dotolo v. Schouten,* 426 So.2d 1013, 1015 (Fla. 2d Dist.Ct.App.1983), and that since it is a continuing tort, the cause of action does not accrue, and thus the limitation period does not begin to run, until the tortious conduct ceases. Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment at 15. The Court will pretermit the issue of whether Indiana or Florida law should be applied determining whether or not misappropriation of trade secrets is a continuing tort.

 Assuming, *arguendo,* that misappropriation of trade secrets is a continuing tort under both Indiana[6] and Florida[7] law,

---

**6.** It appears that misappropriation of trade secrets would be a continuing tort under Indiana law. The split in authority as to whether misappropriation of trade secrets is a continuing tort has been traced to "an underlying disagreement whether trade secrets should be treated under the 'property' view or the 'confidential relationship' view." *Lemelson v. Carolina Enterprises, Inc.,* 541 F.Supp. 645, 659 (S.D.N.Y.1982); *see Anaconda Company v. Metric Tool & Die Company,* 485 F.Supp. 410, 425 (E.D.Pa.1980). Where the tort is viewed as the breach of a confidential relationship, "[t]he fabric of the relationship once rent is not torn anew with each added use or disclosure," and the tort is not continuing. *Monolith Portland Midwest Company v. Kaiser Aluminum & Chemical Corporation,* 407 F.2d 288, 293 (9th Cir.1969); *see Shatterproof Glass Corporation v. Guardian Glass Company,* 322 F.Supp. 854, 869–70 (E.D. Mich.1970), *aff'd,* 462 F.2d 1115 (6th Cir.1972), *cert. denied,* 409 U.S. 1039, 93 S.Ct. 518, 34 L.Ed.2d 487 (1972); *Kearns v. Ford Motor Company,* 203 U.S.P.Q. (BNA) 884, 890 (E.D.Mich.

1978). On the other hand, where the tort is viewed as injury to or adverse use of property, each use constitutes a new tort for purposes of the running of the statute of limitations. *Lemelson v. Carolina Enterprises, Inc.,* 541 F.Supp. at 659; *Anaconda Company v. Metric Tool & Die Company,* 485 F.Supp. at 426; *see also Underwater Storage, Inc. v. United States Rubber Company,* 371 F.2d 950, 955 (D.C.Cir.1967). As the Court previously decided, *supra* at 679, Indiana views trade secrets as property. Thus, it appears that under Indiana law the tort of misappropriation of trade secrets is a continuing tort. The continuing tort provisions of the Uniform Trade Secrets Act lend support to the view that Indiana regards misappropriation of trade secrets as a continuing tort, although these sections are not applicable to the relevant time period in this case. Ind.Code Ann. §§ 24–2–3–7, 24–2–3–8 (West Supp.1983).

**7.** Under Florida law, misappropriation of trade secrets is considered a continuing tort, at least for purposes of the irreparrable harm and inad-

plaintiff's claim is nevertheless barred by the Indiana two year statute of limitations because plaintiff's trade secret was published prior to July 13, 1980. Generally, courts have held that where misappropriation is viewed as a continuing tort and the misappropriator keeps the secret confidential, the continued use of trade secrets gives rise to successive causes of action. *See Lemelson v. Carolina Enterprises, Inc.,* 541 F.Supp. 645, 659; (S.D.N.Y.1982); *Kistler Instrumente A.G. v. PCB Piezotronics,* 419 F.Supp. 120, 123 (W.D.N.Y. 1976). However, if the trade secrets are disclosed or published, then the misappropriator becomes liable to the trade secret owner upon disclosure or publication and the tort is no longer continuing. *See Lemelson v. Carolina Enterprises, Inc.,* 541 F.Supp. at 659; *Kistler Instrumente A.G. v. PCB Piezotronics,* 419 F.Supp. at 123; *Lockridge v. Tweco Products, Inc.,* 209 Kan. 389, 497 P.2d 131, 137–138 (1972). *But see Underwater Storage, Inc. v. United States Rubber Company,* 371 F.2d 950, 955 (D.C.Cir.1967) ("the wrongdoer ... [is] amenable to suit for any use of the secret so long as the use has occurred within the statutory period of limitations immediately preceeding the bringing of the action."). A leading commentator in the trade secrets field has indicated that publication of a trade secret should commence the running of the statute of limitations. 12A Business Organizations, MILGRIM, TRADE SECRETS § 7.04[2] at 7–36, 7–37. In view of these authorities and the fragile nature of the property status of trade secrets, the Court concludes that under either Indiana or Florida law, the statute of limitations for misappropriation begins to run upon disclosure or publication, that is the tort of misappropriation of trade secrets ceases to be a continuing tort after disclosure or publication of the trade secret.

◼ Applying this principle to the case *sub judice,* it is clear that even if misappropriation of trade secrets is a continuing

tort, plaintiff's claim is barred by the two year statute of limitations. At oral argument, counsel for plaintiff indicated that the trade secret at issue in this case had been extinguished at some point. Transcript of Hearing on Motions at 36 (Transcript). Plaintiff's counsel stated that the trade secrets were either included in the patent, which was issued on September 4, 1979, or would have been disclosed upon commercial marketing, which for plaintiff's licensees roughly coincided with the date of the issuance of the patent. Transcript at 4–5. Thus, by plaintiff's own admission, these trade secrets had been extinguished through plaintiff's own publication and disclosure by October, 1979, which is two years prior to commencement of this suit. Consequently, the continuing tort theory provides no relief from the bar of the two year Indiana statute of limitations.

◼ At oral argument, counsel for plaintiff contended that although the trade secret has been extinguished, the injury that occurred as a result of the misappropriation is the relevant continuing tort, and that this injury extended until well after the publication of the trade secret. Transcript at 36–37. It appears, however, that it is the damage from the alleged misappropriation which continued rather than the tort itself. It is the continuing effect of the earlier tort of which plaintiff complains, and not the continuation of the tort itself. However, under both Florida and Indiana law, the statute of limitations runs from when the continuing tort ceased, not from when the injurious effects ceased. Under Indiana law, a new cause of action does not accrue when consequential damages arise from a prior injury and damage, even if the initial damage is slight. *See Monsanto Company v. Miller,* 455 N.E.2d at 394. Similarly, under Florida law, the statute of limitations begins to run when an injury is sustained as a consequence of

equate remedy at law requirements for emergency or preliminary relief. *Dotolo v. Schouten,* 426 So.2d at 1015. Defendant has advanced no persuasive argument as to why the *Dotolo*

Court's view of misappropriation of trade secrets as a continuing tort should not be extended to the statute of limitations context.

the wrongful act of another, although the actual or substantial damages may not occur until a later date. *City of Miami v. Brooks*, 70 So.2d 306, 308 (Fla.1954); *Johnson v. Mullee*, 385 So.2d 1038, 1041 (Fla. 1st Dist.Ct.App.1980). *pet. for rev. denied*, 392 So.2d 1377 (Fla.1981). Thus, the fact that the injury to plaintiff continues beyond the time when the tortious conduct ceases does not mean that the tort continues for statute of limitations purposes. The limitations period began to run when the continuing tort ceased, *i.e.* upon publication of the trade secret in 1979, and plaintiff's claim filed in 1982 is barred by the two year Indiana statute of limitations.

### E. Conclusion

Upon consideration of the memoranda, affidavits, depositions and other supporting materials, the Court finds that defendant's motions for sanctions, to amend, and for summary judgment on collateral estoppel grounds are without merit. However, as to defendant's motion for summary judgment on statute of limitations grounds, the Court concludes there is no genuine issue of material fact and that defendant is entitled to judgment as a matter of law because plaintiff's claim is barred by the applicable Indiana statute of limitations. Fed.R.Civ.P. 56(c). Therefore, it is

ORDERED that:

1. Defendant's motion for sanctions is DENIED. Plaintiff is awarded the costs expended in opposing this motion;

2. Defendant's motion to amend is DENIED;

3. Defendant's motion for summary judgment on collateral estoppel grounds is DENIED; and

4. Defendant's motion for summary judgment on statute of limitations grounds is GRANTED.

The clerk shall enter summary judgment for the defendant.