**BANYAN LICENSING, L.C., Plaintiff,**

v.

**ORTHOSUPPORT INTERNATIONAL, INC., et al., Defendants.**

No. 3:00CV7038.

United States District Court, N.D. Ohio, Western Division.

Dec. 8, 2003.

Ernest B. Lipscomb, III, John A. Wasleff, Michael S. Connor, Alston & Bird, Charlotte, NC, Joseph H. Shull, Venable, Baetjer & Howard, Washington, DC, for Banyan Licensing, L.C., Plaintiff.

Margaret J. Lockhart, John Czarnecki, Cooper & Walinski, Toledo, OH, Jon E. Hokanson, Small Larkin, Los Angeles, CA, Michael S. Scalzo, Marshall & Melhorn, Stephen D. Hartman, Richard M. Kerger, Kerger & Kerger, Toledo, OH, for Alsto, Inc., OrthoSupport International, Inc., Meijer Companies, Ltd. Inc., Allied Foam & Packaging Products, Inc., Dr. Larry Frydman, Defendants.

## ORDER

CARR, District Judge.

This is a patent infringement action in which plaintiff Banyan Licensing has sued defendant Dr. Larry Frydman individually as the sole shareholder of defendant OrthoSupport International, Inc ("OrthoSupport"), a Canadian corporation. This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331. Pending is Frydman's motion for summary judgment for lack of personal jurisdiction. For the following reasons, defendant's motion shall be granted.

### Background

On January 18, 2000, plaintiff Banyan commenced an action in this court for patent infringement. Banyan subsequently amended its complaint to add defendant OrthoSupport, alleging specifically that OrthoSupport's "Sleep Buddy" pillow violated Patent '771, a patent for an orthopedic "leg pillow" which had been assigned by the inventor to Banyan. In April, 2001, this court made a finding of patent infringement against OrthoSupport. That decision was upheld on appeal to the Federal Circuit.

OrthoSupport subsequently filed a bankruptcy proceeding in Canada. This court subsequently granted OrthoSupport a stay with respect to this case. In addition, this court granted Banyan leave to file an amended complaint for the purpose of adding defendant Dr. Larry Frydman, OrthoSupport's sole shareholder and principal employee, as a defendant in his personal capacity. Banyan alleges that Frydman is the alter ego of OrthoSupport, and can be

held liable under a veil-piercing theory for any damages due Banyan for OrthoSupport's infringement. In response, Frydman filed a Fed.R.Civ.P. 12(b)(2) motion to dismiss for lack of personal jurisdiction, which this court denied on March 3, 2003. (Doc. 244.)

Frydman, a citizen of Canada and resident of Ontario, is the president and sole shareholder of OrthoSupport. Frydman invented the Sleep Buddy pillow, which is used by persons with back problems to relieve pain while sleeping. On June 7, 1995, Frydman filed a patent application for the Sleep Buddy. In 1997, Frydman learned of the '771 patent through National Express, a media marketing company that was negotiating both with Frydman and the inventor of the leg pillow covered by plaintiff's '771 patent. National Express asked Frydman to provide indemnity against charges of patent infringement.

Frydman contacted patent attorney Jon Hokanson and asked him to review the '771 patent and its prosecution history. To assist attorney Hokanson, Frydman prepared a list of differences between his Sleep Buddy and the '771 patent. Attorney Hokanson recommended that Frydman sharpen the corners of his leg pillow so that it would more closely resemble a prior art patent. After sharpening the corners of the Sleep Buddy, Frydman began to market the Sleep Buddy. Because no other design alterations were suggested, Frydman allegedly believed his modifications to the Sleep Buddy were sufficient to avoid infringement upon the '771 patent.

Frydman, as president of OrthoSupport, marketed the Sleep Buddy pillow at trade shows in the United States, over the internet, and through catalogues distributed in the United States. Through OrthoSupport, Frydman's sales to Ohio customers produced approximately $13,808. (Doc. 253 at 6.) In addition, OrthoSupport sales to retail establishments in Ohio resulted in approximately $1,583. (*Id.*) The sales sufficed to enable this court to exercise personal jurisdiction over OrthoSupport.

OrthoSupport leased the basement in Frydman's home for office space. OrthoSupport also stored its products, including the Sleep Buddy, in a warehouse in Buffalo, New York. While orders coming from retail outlets or catalog merchants were shipped from the warehouse, orders from individuals were shipped from the OrthoSupport office in Frydman's home.

### Standard of Review

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Id.* at 323, 106 S.Ct. 2548. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting Fed.R.Civ.P. 56(e)).

Once the burden of production shifts, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It in insufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary ma-

terial in support of its position. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548.

In deciding the motion for summary judgment, the evidence of the non-moving party will be believed as true, all doubts will be resolved against the moving party, all evidence will be construed in the light most favorable to the non-moving party, and all reasonable inferences will be drawn in the non-moving party's favor, and all reasonable inferences will be drawn in the non-moving party's favor. *Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 456, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992). Summary judgment shall be rendered only in the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

### Discussion

#### 1. Choice of Law

The parties disagree on the law applicable to Frydman's motion.

█ In the absence of any established body of federal choice of law rules, analysis begins with the Restatement (Second) of Conflicts of Laws (1969) ["Restatement"] as a general source. *See Bickel v. Korean Air Lines Co.,* 83 F.3d 127, 130 (6th Cir.1996). Sections 6 and 145 of the Restatement establishes that Canadian veil piercing standards govern the instant action.

The residual § 145 of the Restatement defines general standards for analysis in tort cases. *See Charash v. Oberlin College,* 14 F.3d 291, 296 (6th Cir.1994) (holding that the law of the state in which the injury took place may be disregarded in favor of some other state if it is shown that the other state has a more significant relationship to the occurrence, the thing and the parties). Moreover, the Ohio Supreme Court has held that the Restatement governs choice of law questions in this state. *Id.* (citing *Morgan v. Biro Mfg. Co.,* 15 Ohio St.3d 339, 342, 474 N.E.2d 286 (1984)).

Section 145 states:

(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

  a. The place where the injury occurred;

  b. The place where the conduct causing the injury occurred;

  c. The domicile, residence, nationality, place of incorporation and place of business of the parties, and

  d. The place were the relationship, if any between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

Restatement (Second) of Conflict of Laws § 145 (1969).

Under § 6 of the Restatement, the general choice-of-law principles are:

(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own choice of law.

(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include:

  a. The needs of the interstate and international systems;

  b. The relevant policies of the forum;

c. The relevant policies of other interested states and the relative interest of those states in the determination of the particular issue;

d. The protection of justified expectations;

e. The basic policies underlying the particular field of law;

f. Certainty, predictability and uniformity of result, and

g. Ease in the determination and application of the law to be applied.

Restatement (Second) of Conflict of Laws § 6 (1971).

District courts have applied the factors set forth in § 145 in infringement actions. *See, e.g., Bates v. Cook, Inc.,* 615 F.Supp. 662 (M.D.Fla.1984). In *Bates* a physician inventor filed an infringement claim for misappropriation of trade secrets. *Id.* at 668. The plaintiff inventor was a resident of Florida, while the defendant corporation was incorporated in Indiana and had its principal place of business in Bloomington, Indiana. *Id.* at 666.

The determinative issue in *Bates* was which state's statute of limitations should apply. *Id.* at 674. Indiana's two-year statute of limitations would have barred the plaintiff's suit, while Florida's longer limitations period would have allowed the case to proceed. *Id.* Applying the most significant relationship test of § 145, the court held that the Indiana statute of limitations barred the plaintiff's infringement action. *Id.* at 676. Looking to the comments to § 145 for guidance, the *Bates* court held:

> [Because] the injury occurred in two or more states, [the place where the injury occurred] does not play [an] important role, and the place of defendant's conduct is given particular weight in determining which state's law is applicable. Restatement (Second) of Conflict of Laws § 145 comment f. Thus, the first factor, the place of injury, does not point

to any particular state because the injury occurred in many states.... Plaintiff has shown no reason why plaintiff's Orlando residence, where the effect of the lost sales was felt most severely, has more than a slight relationship to defendant's worldwide activities.... The relevant place of defendant's conduct in this case is Indiana, where defendant used the trade secrets to develop and manufacture the product which incorporated plaintiff's trade secrets.... Although some of the defendant's alleged misconduct in developing their version of the introducer sets is arguably connected with New Jersey as well as Indiana, the principal locus of defendant's conduct is in Indiana. Thus, the second factor, which is accorded the greatest weight in this [type of] case, points to the application of Indiana law.... [As for the third factor], comment e to § 145 indicates that this factor and these contacts depends largely upon the extent to which they are grouped with other contacts, and generally carries little weight of itself ... [and] the fourth factor, the place where the relationship is centered, if any, between the parties is of little aid in ascertaining the applicable law.... [Thus], under the general choice-of-law principles enumerated in § 6, as evaluated through the assessment of the contacts listed in § 145, Indiana is the state with the most significant relationship to the occurrence and the parties.

*Id.* at 678–79.

The facts of *Bates* are similar to those in this case. Like the defendant corporation in *Bates*, Frydman marketed the Sleep Buddy in many states. Banyan consequently suffered economic injury elsewhere than just in Ohio. Moreover, unlike in *Bates*, where the plaintiff was a resident of the forum state, Banyan, being incorporated in Florida with its principal place of

business in Fort Lauderdale, has only a slight relationship with Ohio.

Because the injury occurred in two or more states, the place where the injury occurred is of minimal importance, and the place of Frydman's conduct is given particular weight under § 145 in determining which state's law is applicable. Restatement (Second) of Conflict of Laws, § 145 comment f. Frydman marketed the Sleep Buddy and other pillows that he invented through OrthoSupport. As in *Bates*, where the infringing conduct occurred in the defendant's state of incorporation, most, if not all, of Frydman's conduct in designing the Sleep Buddy occurred in Canada, where OrthoSupport is incorporated.

The third factor under § 145 requires consideration of the domicile, residence, nationality, place of incorporation, and place of business of the parties. While generally less important than the second factor, the place of business becomes a more important consideration where the interest has a business or financial character, such as in cases of unfair competition or trade disparagement. Restatement (Second) of Conflict of Laws § 145 comment e. Here, OrthoSupport's principal place of business is in Canada. Applying this factor favors applying Canadian law.

In *Bates* the court gave no weight to the fourth factor, the place where the relationship, if any, between the parties is centered. As in *Bates*, where the contacts creating the relationship occurred outside of the forum state or through interstate communication, none of the contacts between Frydman and Banyan occurred in Ohio. Thus, the fourth factor adds nothing to the choice-of-law analysis.

Consideration of the factors set forth in § 6 of the Restatement also favors applying Canadian law. First, the general policy in Ohio is to apply the law of the state of incorporation. *See Promotion Co. v.*

*Sweeney*, 150 Ohio App.3d 471, 782 N.E.2d 117 (2002) (holding that although Indiana law was contractually designated as the law to be applied when interpreting the contract, whether or not an Ohio corporation existed was a matter of Ohio law). In addition, although United States patent law applies to the substantive issue in this case, applying Canadian veil-piercing law does not affect the policies underlying American patent law. Finally, I agree with defendant that Canadian veil-piercing law is not so complex or underdeveloped that this court cannot apply Canadian law with ease.

Under the general factors enumerated in § 6, as evaluated through the assessment of the contacts enumerated in § 145, Canada has the most significant relationship to the instant action. Thus, Canadian veil-piercing law governs the instant action.

### 2. Canadian law

■ Defendant Frydman next argues that plaintiff has failed to set forth sufficient facts to establish that the corporate veil should be pierced. I agree.

Under Canadian law, in the absence of findings of fraud, deceit, dishonesty or want of authority, a corporate officer will rarely be liable personally for actions of a corporation. *ScotiaMcLeod Inc. v. Peoples Jewellers Ltd.*, 26 O.R.3d 481 at ¶ 25 (C.A.1995). The authorities make clear that officers of corporations who are the directing minds of the corporation have the same identity of interest as the directors and thus the same immunity from suit. *Id.* at ¶ 39. Thus, officers of corporations are protected from personal liability unless plaintiff can establish that the officer established a separate identity or interest from that of the corporation. *Id.* at ¶ 25.

A Canadian court has addressed the issue of whether a corporate director's con-

duct was sufficient to give rise to personal liability in factually similar circumstances. *See Mentmore Mfr. Co. v. National Merchandise Mfr. Co.*, 89 D.L.R. (3d) 195, ¶ 6 (Fed.C.A.1978). In *Mentmore*, a defendant corporation was found to have infringed the plaintiff's patent on a retractable pen. *Id.* at ¶ 2. The issue on appeal was whether the corporation's president, due to the nature of his involvement in the manufacture and sale of the infringing pens, could be held personally liable for the infringement. *Id.* at ¶ 5.

After the plaintiff learned of defendant's infringement, plaintiff notified defendant that sale of pens that were not of plaintiff's manufacture constituted deliberate infringement of plaintiff's patent. *Id.* at ¶ 8. The plaintiff also assured the defendant that appropriate action would be taken if the infringement did not stop. *Id.* After the defendant continued producing parts and selling the pens, the plaintiff wrote to defendant:

> On March 10, 1960, we notified you that we hold the patent rights to Canadian Patent # 554,988.... Subsequently this matter was discussed with you on the telephone, and on visits to your office by Mr. Warren Shea. During one of these visits, in the fall of 1962, this matter was discussed in some detail and when apprised of our license terms, you indicated that the quantity of slim parts and pens you had been making was insufficient to warrant your continuance. Subsequently, instead of phasing out your manufacturing of the slim pens and parts, you enlarged your infringement by extending your manufacture.... You are hereby notified to cease and desist from further infringement of this patent....

*Id.* at ¶ 10.

Subsequently, the plaintiff filed an action against defendant, alleging specifically that the defendant, as director of the corporation, "expressly directed, ordered, authorized, aided and abetted" the defendant corporation to perform the infringement acts. *Id.* at ¶ 12. In agreeing with the trial judge's decision that this was not enough to make defendant personally liable for the infringement, the appeals court held:

> It would render the offices of director or principal officer unduly hazardous if the degree of direction normally required in the management of a corporation's manufacturing and selling activity could by itself make the director or officer personally liable for infringement by his company. This is a principle that should apply, I think, not only to the large corporation by also to the small, closely held corporation as well. There is no reason why the small, one-man or two-man corporation should not have the benefit of the same approach to personal liability merely because there is a generally and necessarily a greater degree of direct and personal involvement in management on the part of its shareholders and directors. This view finds support, I believe, in the cases.... I, therefore, have no difficulty in concluding, with respect, that the learned trial judge was correct in holding that the fact [that defendant] imparted the practical, business, financial and administrative policies and directives which ultimately resulted in the assembly of some goods [that were found to be] infringing, was not by itself sufficient to give rise to personal liability.... In my opinion there must be circumstances from which it is reasonable to conclude that the purpose of the director or officer was not the direction of the manufacturing and selling activity of the company in the ordinary course of his relationship to it but the deliberate, willful and knowing pursuit of a course of conduct that was

likely to constitute infringement or reflected an indifference to the risk of it. *Id.* at ¶¶ 24–25.

The court noted that there can be no precise test and there must be a broad appreciation of the circumstances of each case to determine whether as a matter of policy they call for personal liability. *Id.* at ¶ 31.

Applying *Mentmore* to the instant action, plaintiff has failed to establish that Frydman maintained an interest separate from that of OrthoSupport. First, I find nothing in the record to establish that Frydman's conduct ever diverted from the scope of his office as president of OrthoSupporttion. Like the director in *Mentmore*, Frydman's conduct never exceeded the practical, business and financial interests of OrthoSupport. Because OrthoSupport is essentially a one-person corporation, Frydman was necessarily heavily involved in every facet of its activities. Banyan should not be able to take advantage of this circumstance alone to hold Frydman personally liable. *Id.* at ¶¶ 24–25.

In addition, the record in this case establishes that, with regard to the issue of fraud or deceit, Frydman has an even stronger argument against veil-piercing than the defendant in *Mentmore*. In that case there was no evidence that the defendant took any precautionary measures on learning of his possible infringement. Instead, the defendant in *Mentmore* ignored assertions that his products infringed the plaintiff's patent; indeed, he continued to engage in infringing activities.

The record in this case shows that Frydman, on learning of the possible infringement through National Express, sought the advice of an attorney regarding his Sleep Buddy. Only after following the attorney's advice did Frydman continue to market his product. Such conduct dispels an allegation of deliberate, willful and knowing pursuit of a course of conduct that was likely to constitute infringement or reflected an indifference to the risk of infringement.

Because plaintiff has failed to set forth sufficient facts to permit piercing the corporate veil to reach Frydman, he cannot be held personally liable.

## CONCLUSION

In light of the foregoing, it is,

ORDERED THAT defendant Frydman's motion for summary judgment for lack of jurisdiction over the person be, and hereby is, granted.

So ordered.